# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | |
| | | **Criminal No. ELH-19-0483** |
| **ELIJAH PARKER,** | * | |
| **Defendant.** | * | |
| | ...oOo... | |

## GOVERNMENT'S SUPPLEMENTAL BRIEFING
## REGARDING DEFENDANT PARKER'S PRETRIAL MOTION TO SUPPRESS

Robert K. Hur
United States Attorney

By:_____/s/_____
Lindsey N. McCulley
Patricia McLane
Assistant United States Attorneys

October 20, 2020

# TABLE OF CONTENTS

FACTUAL BACKGROUND ............................................................................... 3

PROCEDURAL BACKGROUND ...................................................................... 6

ARGUMENT .................................................................................................... 7

   A.  Officer Wharton did not seize Parker until he told Parker that he could not leave the laundromat. ............................................................................................ 8

   B.  Officer Wharton had at least reasonable suspicion to stop Parker for trespassing at the time he seized him. ..................................................................... 9

   C.  Officer Wharton was qualified to smell the odor of marijuana and detected the odor of marijuana on Parker before he seized him. ....................................... 14

   D.  The odor of marijuana gave Officer Wharton probable cause to arrest Parker for possession of marijuana whether federal or Maryland law controls. ............. 16

      1.  Federal interpretation of what constitutes probable cause controls. ........... 16

      2.  Under *Humphries*, Officer Wharton had probable cause to arrest Parker at the time Parker was seized ................................................................................. 17

      3.  *Davis* precludes exclusion of the seized evidence if Maryland courts' interpretation of what constitutes probable cause controls. ............................. 21

   E.  Parker's attempted flight before Officer Wharton could place him in handcuffs gave Officer Wharton probable cause to arrest Parker whether the initial stop was legal or illegal. ........................................................................... 23

      1.  The initial stop was lawful and Parker's actions provided probable cause to arrest for additional crimes. ............................................................................... 24

      2.  If the initial stop had not been lawful, Parker's subsequent actions still would have given Officer Wharton probable cause to arrest. .......................... 25

CONCLUSION ................................................................................................ 28

On September 22, 2020, following a motions hearing, the Court requested additional briefing from the parties to address issues in the case that the parties had not briefed. The United States of America, by its undersigned counsel, submits this Supplemental Brief to address those questions and request that the Defendant's Motion to Suppress Property be denied.

## FACTUAL BACKGROUND

Officer Patrick Wharton has been a member of the Frederick Police Department for seven years. ECF 40, Transcript (Tr.) at 6:18-20.[1] He has worked the midnight patrol shift for the Frederick Police Department for approximately four years. Tr. at 7:1-3. He has made approximately 500 arrests. Tr. at 7:7-11. He has stopped approximately 30 individuals after smelling marijuana on their person. Tr. at 8:7-11. He testified that he was in the military for four years and was trained on the smell of controlled dangerous substances for identification. Tr. at 38:19-39:2. In addition he had eight hours of detection and recognition of controlled dangerous substances training from the police academy for the Frederick Police Department. Tr. at 38:19-39:2. He testified he had been part of various arrest involving the smell of marijuana in his seven years at the Frederick Police Department. Tr. at 39:6-8.

By March 20, 2019, Officer Wharton was familiar with the Fourth Street Laundromat in Frederick, Maryland. He was asked by the owner of the laundromat to conduct patrol checks because the owner had frequent trespassers in the laundromat. Tr. at 9:14-21. He testified that the inside of the laundromat was a smidge smaller than the size of the courtroom. Tr. at 12:23-13:1. The laundromat has approximately 25 washers and 8-10 dryers. Tr. at 12:16-22. Officer Wharton knew the business was not very large, and, at that time, had a no trespassing sign hanging in the center of the building by a television above the washers. Tr. at 10:7-12. A picture of the sign as

---

[1] All citations to "Tr." are to the Motions Hearing transcript at ECF 40.

it was on March 20, 2019 was introduced as Exhibit 2 to the Motions Hearing. *See* Exhibit 2 (Ex. 2) to Motions Hearing; Exhibit List at ECF 36.[2] He also pointed out the "no trespassing" sign as it could be seen on his body worn camera. Tr. at 16:3-6; *see also* Exhibit 1 (Ex. 1) to Motions Hearing; Exhibit List at ECF 36, at 00:16.[3]

Officer Wharton had cited approximately ten people for trespassing at the Fourth Street Laundromat before March 20, 2019. Tr. at 11:16-23. Officer Wharton was familiar with the characteristics that trespassers in that laundromat typically display. Officer Wharton testified that when he checked the laundromat for trespassers, he would first look and listen to see if laundry is being done. Tr. at 12:4-15. He testified that the washers and dryers are loud he could hear them inside the laundromat if they were running. Tr. at 18:17-21. He testified that when people had been trespassing in the past, they were typically by the table and chair in the back of the business or in the bathroom. Tr. at 13:3-17. He said trespassers would often hang out there because there is a wall outlet. Tr. at 19:3-8. He said that he had seen people before in the back charging their phones when they were not doing laundry and, in the end, cited them for trespassing. Tr. at 20:7-11. He also testified that complaints of individuals trespassing in the laundromat usually occurred from midnight to five in the morning. Tr. at 17:12-18.

On March 20, 2019, Officer Wharton stopped at the Fourth Street laundromat. Tr. at 13:19-22. When Officer Wharton entered the laundromat it was approximately 2:30 a.m. Tr. at 13:19-14:5. He saw Parker, who was the only person in the laundromat. Tr. at 18:25-19:2. When he saw Parker, Officer Wharton activated his body worn camera. Tr. at 14:20-15:3. His body

---

[2] All citations to "Ex. 2" is to the photograph of the "no trespassing" sign that was admitted at Exhibit 2 at the Motions Hearing.
[3] All citations to "Ex. 1" is to the body worn camera that was admitted at Exhibit 1 at the Motions Hearing.

worn camera was introduced as Exhibit 1 to the Motions Hearing. *See* Ex. 1. Officer Wharton testified that he looked to see if there was any laundry being done and there was nothing spinning in the washers and there was no laundry piled up anywhere. Tr. at 17:5-11. He testified that he also listened to hear if any washers or dryers are running, and that he did not hear any. Tr. at 18:8-16. He also testified that he did not see any clothes around Parker. Tr. at 19:9-11.

Officer Wharton then asked Parker if he was doing laundry. Parker said that he was done and was just charging his phone. Tr. at 22:11-19. Officer Wharton could not see any clothes around or anything else that would have indicated that Parker had, in fact, been doing laundry. Tr. at 22:14-19. The body worn camera shows the same. *See* Ex. 1. He also testified that when Parker said he was "charging his phone," it was an indicator that he was trespassing to charge his phone, similar to other arrest for trespassing Officer Wharton made previously when he found individuals charging their phones and not doing laundry. Tr. at 22:23-23:17. The body worn corroborates Officer Wharton's testimony. The video shows Parker standing in the back of the business leaning over a table while his phone is plugged into a wall outlet. Exhibit 1 at 0:43.

Officer Wharton asked Parker if he had any identification, and Parker said he did not. Ex. 1 at 0:45. Officer Wharton testified that as he was talking to Parker, and before Parker attempted to leave, he could smell the odor of burnt marijuana coming from Parker. Tr. at 24:4-10. When Parker started to walk towards the exit, Officer Wharton told him he could not go because Officer Wharton believed he was trespassing and smelled burnt marijuana emanating from him. Tr. at 23:22-24:3. Parker admitted that he had smoked the day before. Ex 1 at 1:17. Parker also repeated that he was charging his phone. Tr. at 25:10-13. Officer Wharton told Parker he needed to identify him. Ex. 1 at 1:37. Parker again told the officer that he did not have identification, but he gave him a name, which did not come back to anyone in the system

(and was a fake name). Tr. at 25:1-26:3. Officer Wharton testified that the only way the name would not have come back is if the person did not have a driver's license and never had any interaction with police. Tr. at 41:23-42:16.

Officer Wharton continued to ask Parker questions. He asked if he had given him a fake name since the name did not come back to anyone in the system. Ex. 1 at 2:55. Officer Wharton told Parker he could have a seat in the chair if he wanted. Ex 1 at 3:28 seconds. Officer Wharton can be heard on the radio confirming that another officer was on his way. Ex. 1 at 3:34. Officer Wharton then asked Parker to take his backpack off and place it on the table. Ex. 1 at 4:08. Officer Wharton explained to Parker again that he believed he was trespassing and that Officer Wharton smelled "weed" coming from him. Ex. 1 at 4:12.

Officer Wharton then walked toward Parker and told him he would be placed in handcuffs. Ex. 1 at 4:22. The body worn camera shows another Officer can be seen arriving. Ex. 1 at 4:26. Officer Wharton tells Parker that he is going to put him in handcuffs and search him. He says if he does not find anything, or even if he does, he will just receive some citations. Ex. 1 at 4:32. Before Officer Wharton can do anything else, Parker runs towards the door, which was also towards the other officer that had arrived. Ex. 1 at 4:32. Parker runs right into the other officer and both officers grab Parker by the coat. Ex 1. at 4:36. The body worn camera is then obscured because Officer Wharton is struggling with Parker who is still attempting to flee. Ex. 1 at 4:48. Parker's hands are seen swinging and hitting the officer as he is attempt to get off the ground. Ex. 1 at 5:08. Parker eventually is subdued with pepper spray. Ex 1. 5:30.

## PROCEDURAL BACKGROUND

On January 30, 2020, Parker filed a motion to suppress property. ECF 16. The motion argued that Officer Wharton's stop of Parker was an unconstitutional *Terry* stop because, he

claimed, Officer Wharton lacked reasonable suspicion that Parker was trespassing when he told Parker that Parker was not permitted to leave the laundromat. A motions hearing was delayed due to the still-ongoing global pandemic. After a schedule was put in place, the Government responded to the motion on August 4, 2020. ECF 30. A motions hearing was held on September 22, 2020. ECF 33. Officer Patrick Wharton of the Frederick Police Department testified and was subject to cross-examination at the hearing. Both parties made arguments to the Court.

At the conclusion of the motions hearing, the Court requested additional briefing from the parties to address issues that had come up during the hearing. The Government requested and the court reporter filed a transcript from the motions hearing. ECF 40. In this supplemental brief, the Government addresses the issues raised during the motions hearing.

## ARGUMENT

Officer Wharton seized Parker when he told him he could not leave. At that time, Officer Wharton had at least reasonable suspicion to stop Parker for trespassing and probable cause to arrest Parker for possession of marijuana. As to the possession of marijuana, Officer Wharton was qualified to detect the odor of marijuana. That odor gave the officer probable cause to arrest under the Fourth Circuit's decision in *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004). Moreover, even if the Maryland courts' probable cause analysis controlled, it was the same as the Fourth Circuit's in 2019 when Parker was arrested so *Davis v. United States,* 564 U.S. 229 (2011) precludes application of the exclusionary rule to evidence uncovered incident to arrest. Finally, and alternatively, Parker's attempted flight and struggle with officers provided probable cause to arrest for additional crimes regardless of the legality of the initial stop.

**A. Officer Wharton did not seize Parker until he told Parker that he could not leave the laundromat.**

The Fourth Amendment is not implicated when a law enforcement officers approach someone in a public place and asks him or her a few questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). It is not until a person is "seized" that the Fourth Amendment requires law enforcement to have reason to seize. *Michigan v. Chesternut*, 486 U.S. 567, 574-575 (1988). A seizure occurs only when "under the totality of the circumstances, a reasonable person in the suspect's position would not feel free to leave or otherwise terminate the encounter." *United States v. Perry,* 560 F.3d 246, 253 (4th Cir. 2009) (citation and internal quotation marks omitted); *United States v. Drayton*, 536 U.S. 194, 201 (2002). In determining whether a reasonable person would feel free to leave, courts may consider factors such as the number of police officers involved in the stop, whether they were wearing uniforms, whether the blocked the person from leaving, whether their tone was conversational, and whether they were displaying their weapons. *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989). A seizure does not occur merely because officers "approach[ ] individuals on the street ... and put[ ] questions to them if they are willing to listen." *Drayton*, 536 U.S. at 200-01; *see also, e.g., United States v. Weaver*, 282 F.3d 302, 311-12 (4th Cir. 2002) (concluding that a pedestrian approached by an officer in a public parking lot in broad daylight could have walked away from the encounter even though it may have created an awkward situation).

Requesting an individual's identification, without more, does not amount to a seizure. *United States v. Mendenhall*, 446 U.S. 544, 555 (1980) ("The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions."); *United States v. Radcliffe*, 757 F. App'x 250, 252–54 (4th Cir. 2018) (finding officers approaching with tactical vests, holstered sidearms,

and demanding and retaining identification not a seizure because defendant could have refused to answer or provide his identification).

Further, questions where the answer could implicate the individual in a crime do not transform a police encounter into a seizure. The Supreme Court had stated that a person's voluntary answers to questions can be used in a criminal prosecution of that person. *Florida v. Royer*, 460 U.S. 491, 497 (1983). In *United States v. Ward*, 482 Fed. App'x 771, 772-73 (4th Cir. 2012), law enforcement officers encountered the defendant while they were in an unmarked police truck and asked the defendant whether he was carrying a gun. The Fourth Circuit found that this was not a seizure because the officers did not draw their guns, did not command the defendant to stop, did not touch him, and merely asked one question. *Id.*

Here, Officer Wharton's initial interaction with and questions to Parker did not implicate the Fourth Amendment. Officer Wharton asked Parker a few questions when he encountered him in the laundromat before he told Parker he could not leave. When Officer Wharton asked these questions, his gun was holstered and he was the only officer there. Officer Wharton asked Parker if he was doing laundry and for identification. Officer Wharton did not need reasonable suspicion or probable cause to simply ask Parker these questions. It was not until Parker tried to leave that Officer Wharton told Parker he could not go because the officer believed he was trespassing and he smelled the odor of burnt marijuana coming from him. Tr. at 23:22-24:3. At that point, Officer Wharton had at least reasonable suspicion to investigate Parker for trespassing and possession of marijuana and, at most, had probable cause to arrest Parker for the same.

**B. Officer Wharton had at least reasonable suspicion to stop Parker for trespassing at the time he seized him.**

An officer may stop and briefly detain a person for investigative purposes when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. *Illinois v.*

*Wardlow*, 528 U.S. 119, 124 (2000). Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]" *Id* at 123-24. Reasonable suspicion means "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (citations and internal quotation marks omitted). The intrusion created by an investigative stop is minimal, and the reasonable suspicion standard is not onerous. *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001).

When reviewing whether an officer developed reasonable suspicion, the court is to look at the totality of the circumstances, which includes information known to the officer and any reasonable inferences to be drawn at the time of the stop. *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002). The court is to credit the "practical experience of officers who observe in a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Arvizu*, 534 U.S. at 273-74; *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) ("…our determination of reasonable suspicion must give due weight to common sense judgments reached by officers in light of their experience and training."). In *Arvizu*, 534 U.S. at 275-76, the Supreme Court explained that while certain behavior might be unremarkable in some instances, it could be unusual in another. The Court reasoned that to answer whether the behavior is suspicious, an officer is entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants. *Id.*

Further, a determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. *See Wardlow,* 528 U.S. at 125-26 (2000) (explaining that flight from police is not necessarily indicative of ongoing criminal activity but can be used to support reasonable suspicion). In many instances, several actions that might otherwise seem innocent in isolation can create reasonable suspicion when they occur together. And a court is not to analyze each fact or action to determine if that fact or act alone is suspicious. In *Arvizu*, the Supreme Court rejected the lower court analyzing each individual act and determining whether it was innocent or suspicious. 534 U.S. at 275-76. The Supreme Court explained that its prior opinion in *Terry v. Ohio*, 392 U.S. 1, 30 (1968), precluded that sort of divide-and-conquer analysis.[4]

In *Arvizu*, police stopped a driver who slowed down, stiffened his posture, and failed to acknowledge a sighted law enforcement officer. 534 U.S. at 270-71, 277. His children were in the vehicle with elevated knees, suggesting concealed cargo, and engaging in extended periods of mechanical-like waiving. *Id.* at 277. The driver argued that his behavior merely suggested a family in a minivan on a holiday outing. *Id.* The Court determine that although each of the driver's actions alone could have had an innocent explanation, taken together, they were sufficient to form reasonable suspicion for the officer to stop the vehicle. 534 U.S. at 277-78.

Further, in determining whether reasonable suspicion exists, the emphasis must be on the facts that the officer had before him, not the facts he could have had. For example, in *United States v. McCoy,* 513 F.3d 405, 415 (4th Cir. 2008), an experienced police officer was conducting surveillance in a grocery store parking lot, where, he testified, many illegal drug

---

[4] In *Terry*, an officer observed individuals repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of acts was "perhaps innocent in itself," the Supreme Court held that, taken together, they "warranted further investigation." 392 U.S. at 22.

transactions in the area occurred. *Id.* at 407-08. The officer saw a truck park in front of the defendant's car and overheard the truck driver and the defendant discuss where to meet. *Id.* at 408. The officer then observed both vehicles leave the parking lot and drive to another grocery store parking lot. *Id.* The defendant then entered the truck, spoke with the driver, and exited the truck after about a minute. *Id.* The truck driver then began to drive away. *Id.* The district court suppressed the fruits of the seizure, noting that the officer did not hear the entirety of the defendant's conversation with the driver, did not observe a hand-to-hand drug transaction, and did not have any knowledge that either party was involved with drugs. *Id.* at 412. The Fourth Circuit reversed, noting that the district court erred in emphasizing what "factual circumstances did not exist" and in considering "the 'innocent' facts here without considering how an experienced police officer might approach the same factual circumstances." *Id.* at 413.

The relevant trespassing law is found at Maryland Criminal Law §6-402. It provides that "[a] person may not enter or trespass on property that is posted conspicuously against trespass by: signs placed where they reasonably may be seen[]." The Fourth Street Laundromat had such a sign. The photograph of the no trespassing sign was entered into evidence and Officer Wharton testified where the sign was displayed. *See* Ex. 2 and Tr. 10:7-22. The sign was clearly visible in the laundromat and, therefore, conspicuously displayed as required by the law.

Before stopping Parker on March 20, 2019, Officer Wharton had cited approximately ten people for trespassing at the Fourth Street Laundromat. Tr. at 11:16-23. Like the officer in *Arvizu*, he was familiar with the laundromat and trespassers there. He described the layout of the laundromat, the size, and the number of washers and dryers. Tr. at 12:23-13:1; 12:16-22. He also testified that the washers and dryers were loud, and he could hear them if he was inside the business. Tr. at 18:17-21. He explained when he would typically see trespassers in the business,

where they would often be in the business, and what they would be doing.  Tr. at 13:3-17.

Specifically, he testified that trespassers were typically by the table and chair in the back of the

business or in the bathroom. Tr. at 13:3-17.  He said trespassers would often hang out there

because there is a wall outlet. Tr. at 19:3-8. He said that he had seen people before in the back

charging their phones when they were not doing laundry and cited them for trespassing.  Tr. at

20:7-11. He also testified that complaints of individuals trespassing in the laundromat usually

occurred from midnight to five in the morning. Tr. at 17:12-18.

     With this experience, on March 20, 2019, Officer Wharton stopped at the Fourth Street

Laundromat.  When Officer Wharton entered the laundromat it was approximately 2:30 a.m. Tr.

at 13:19-14:5. He saw Parker , who was the only person in the laundromat.  Tr. at 18:25-19:2.

Officer Wharton testified that he looked to see if there was any laundry being done and there was

nothing spinning in the washers and no laundry piled up anywhere.  Tr. at 17:5-11. He testified

that he also listened to hear if any washers or dryers are running, and that he did not hear any. Tr.

at 18:8-16. He also testified that he did not see any clothes around the defendant. Tr. at 19:9-11.

All these seemingly innocent facts began to form a familiar picture to Officer Wharton.

     Officer Wharton then asked the defendant if he was doing laundry.  Parker said that he

was but was just charging his phone at that time.  Tr. at 22:11-19. Officer Wharton could not see

any clothes around or anything else that would have indicated that the defendant had, in fact,

been doing laundry.  Tr. at 22:14-19. The body worn camera shows the same.  *See* Ex. 1.  Officer

Wharton also testified that Parker saying that he was charging his phone indicated to the officer

that Parker was just there to charge his phone because there was nothing to suggest that he had

been doing laundry, and Officer Wharton had found individuals trespassing there before when

they were charging their phone. Tr. at 22:23-23:17.  These actions—no washer or dryer running,

no laundry around Parker, Parker charging his phone in the back leaning over the table, and Parker saying he was charging his phone—coupled with Officer Wharton's past experience with trespassers in that laundromat and common sense inferences, turn these numerous facts that might otherwise be innocent into at least reasonable suspicion that Parker was not doing laundry. Officer Wharton's detention of Parker was therefore lawful based on these facts alone.

### C. Officer Wharton was qualified to smell the odor of marijuana and detected the odor of marijuana on Parker before he seized him.

Marijuana has a distinct smell that is easy to detect. *See, e.g. United States v. Bronstein*, 521 F.2d 459, 461 (2d Cir. 1975) ("It is well understood that marijuana…has an offensive and pungent aroma."); *United States v. Morin,* 949 F.2d 297, 300 (10th Cir.1991) (holding that, because marijuana has a distinct smell, "the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage"). Indeed, at least one federal circuit has found, in an unpublished decision, that the odor of marijuana is so common and distinct that no particular training is necessary to detect it. *United States v. McCaster*, 466 F. App'x 443, 446 (6th Cir. 2011) ("We further note that this circuit has never required an officer claiming to have smelled burnt marijuana—a common and distinctive odor—to show he had particular training and experience in detecting marijuana."); *United States v. Matthews*, 422 F. Supp. 3d 1235, 1246 (W.D. Ky. 2019) ("Even if Woodford did not have any training or experience with the smell of marijuana, the Sixth Circuit does not require an officer marijuana claiming to have smelled burnt marijuana to show that he had particular training and experience in detecting marijuana.").

Other courts have found a police officer's general training and on the job experience sufficient to detect the distinct odor of marijuana. In *United States v. Muti*, 2009 WL 3296091, at *2 (E.D.N.C. Oct. 13, 2009), the Eastern District of North Carolina accepted that an officer detected the faint smell of marijuana based on his receiving of narcotics training and five years'

experience as a law enforcement officer. *See also United States v. Harris*, 2019 WL 6704996, at

*3 (E.D.N.C. Dec. 9, 2019) (accepting that an officer could detect the smell of marijuana based

on the fact that he had "investigated marijuana in the past," "[o]n patrol as well as in the

narcotics unit," and had "smelled the odor of burned marijuana" before in the course of such

experience); *People v. Stout*, 477 N.E.2d 498, 502-03 (Ill. 1985) (accepting officer's testimony

that he smelled the odor of marijuana where "during a training session, he had smelled the odor

of a burning confiscated substance later confirmed to be cannabis; he had also smelled the odor

of burning substances, later confirmed by forensic scientists as cannabis, on "numerous other

occasions" during his seven-year employment as a patrol officer; and he had smelled the odor of

cannabis in college."); *Taylor v. State*, 20 S.W.3d 51, 55 (Tex. App. 2000) ("Horton testified that

he had smelled mari[j]uana in the past on many occasions and that when he approached Taylor's

truck, he 'could smell the odor of marijuana coming from somewhere on the truck.'").

Officer Wharton's training and experience is sufficient to detect the odor of marijuana,

and his testimony that he smelled marijuana emanating from Parker before he told him he could

not leave the laundromat should be accepted. Officer Wharton has been a member of the

Frederick Police Department for seven years. Tr. at 6:18-20. Prior to this position, he was in the

military for four years. He has made approximately 500 arrests. Tr. at 7:7-11. He has stopped

approximately 30 individuals after smelling marijuana on their person. Tr. at 8:7-11. He testified

that he was in the military for four years and there he was trained on controlled dangerous

substance odors for identification. In addition he had eight hours of detection and recognition of

controlled dangerous substances training from the police academy for the Frederick Police

Department. Tr. at 38:19-39:2. Further, he testified he had been part of various arrests involving

the smell of marijuana in his seven years at the Frederick Police Department. Tr. at 39:6-8.

Officer Wharton testified that he smelled marijuana emanating from Parker as he was talking to him and before he told him he could not leave the laundromat. Tr. at 24:4-10. He also testified that Parker was the only person in the laundromat, aside from Officer Wharton, at the time. Tr. at 18:22-19:2. He was qualified to detect the odor and he detected it on Parker. The Government respectfully requests that the Court credit Officer Wharton's testimony based on his prior training and experience in detecting the odor of marijuana.

### D. The odor of marijuana gave Officer Wharton probable cause to arrest Parker for possession of marijuana whether federal or Maryland law controls.

Federal interpretation of what constitutes probable cause to arrest for possession of marijuana controls in this case and, as explained below, *Humphries*, 372 F.3d at 657, held that the odor of marijuana is sufficient probable cause to arrest for possession of marijuana. Further, even if the Maryland courts' interpretation of what constitutes probable cause controlled, *Lewis v. State*, 237 Md. App. 661 (2018) *rev'd and remanded*, 470 Md. 1 (2020) held that the odor of marijuana was sufficient probable cause to arrest. That case was not overturned until 2020. This arrest occurred in 2019 and under *Davis,* 564 U.S. at 229, the exclusionary rule does not apply when an officer acts in accordance with binding precedent.

### 1. Federal interpretation of what constitutes probable cause controls.

"In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Elkins v. United States*, 364 U.S. 206, 223–24, (1960). "[T]he proper standard for evaluating illegal search and seizure claims in federal courts has uniformly been 'whether the actions of the state officials in securing the

evidence violated the Fourth Amendment to the United States Constitution.'" *United States v. Clyburn*, 24 F.3d 613, 616 (4th Cir. 1994) (internal citations omitted).

"[A] warrantless arrest satisfies the Constitution so long as the officer has 'probable cause to believe that the suspect has committed or is committing an offense.'" *Virginia v. Moore*, 553 U.S. 164, 173 (2008). "[W]hile States are free to regulate [ ] arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Id.* at 176. "[W]hether or not a search is reasonable within the meaning of the Fourth Amendment," has never "depend[ed] on the law of the particular State in which the search occurs." *Id.* at 172.

Whether the facts Officer Wharton encountered on March 20, 2019 constituted probable cause to arrest Parker for an offense based on the odor of marijuana is controlled by federal law.

### 2. Under *Humphries*, Officer Wharton had probable cause to arrest Parker at the time Parker was seized.

Federal law makes it illegal to possess marijuana. *See* 21 U.S.C. §§ 812; 844. Maryland law makes it criminal to possess over ten grams of marijuana. The law provides:

> (a) Except as otherwise provided in this title, a person may not:
> (1) possess or administer to another a controlled dangerous substance, unless obtained directly or by prescription or order from an authorized provider acting in the course of professional practice
> …
> (c)(2)(i) Except as provided in subparagraph (ii) of this paragraph, a person whose violation of this section involves the use or possession of marijuana is guilty of a misdemeanor of possession of marijuana and is subject to imprisonment not exceeding 6 months or a fine not exceeding $1,000 or both.
> (ii) 1. A first finding of guilt under this section involving the use or possession of less than 10 grams of marijuana is a civil offense punishable by a fine not exceeding $100.
> 2. A second finding of guilt under this section involving the use or possession of less than 10 grams of marijuana is a civil offense punishable by a fine not exceeding $250.
> 3. A third or subsequent finding of guilt under this section involving the use or possession of less than 10 grams of marijuana is a civil offense punishable by a fine not exceeding $500.

Md. Code, Crim Law § 5-601.

If supported by probable cause, an officer may make a warrantless arrest of an individual in a public place. *Maryland v. Pringle*, 540 U.S. 366, 369 (2003). "Probable cause" sufficient to justify an arrest requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). In *United States v. Kelly*, 592 F.3d 586, 591-92 (4th Cir. 2010), the Fourth Circuit explained:

> Probable cause is not readily, or even usefully, reduced to a neat set of legal rules. However, the Supreme Court has described it as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found. When assessing probable cause, we must examine the facts from the standpoint of an objectively reasonable police officer, giving due weight to inferences drawn from those facts by . . . local law enforcement officers.

(internal citations and quotation marks omitted). Thus, whether the officer has probable cause is a fact-based inquiry that considers the totality of the circumstances. *Humphries*, 372 F.3d at 657.

In *Humphries*, 372 F.3d at 658, an experienced officer saw an individual in a high crime area and detected the "distinct odor of marijuana" and continued to smell it as he approached the defendant. When the officer was 5-10 feet from the defendant he continued to smell the odor of marijuana, and then smelled it again around the defendant when he followed the defendant a house that the defendant entered. *Id.* at 655-56. The defendant was arrested and searched. The defendant moved to suppress the property found search incident to arrest and the Fourth Circuit reversed. *Id.* at 660. The Fourth Circuit held: "if an officer smells the odor of marijuana in circumstances where the officer can localize its source to a person, the officer has probable cause

to believe that the person has committed or is committing the crime of possession of marijuana." *Id.* at 659. The Court explained that "[w]hile smelling marijuana does not assure that marijuana is still present, the odor certainly provides probable cause to believe that it is." *Id.* at 658.[5]

A recent case, *Radcliffe*, 757 F. App'x at 251–53, applied *Humphries*. There, an officer smelled an odor of marijuana originating from the defendant and the defendant told the officer that he had recently smoked marijuana and had some on his person. In addition, the officer testified that the defendant was unusually nervous. *Id.* at 253. The Fourth Circuit concluded that the officer had probable cause to arrest the defendant for possession of marijuana. *Id.* at 252-53.

---

[5] In addition to justifying the arrest of a person when the smell can be localized to that person, the Fourth Circuit has repeatedly found that the smell of marijuana provides probable cause to believe that it may be found in the vehicle or residence. *See United States v. Richardson*, 801 F. App'x 157, 158 (4th Cir. 2020) ("However, an officer's detection of the odor of marijuana is sufficient to establish probable cause to search a vehicle."); *United States v. White*, 836 F.3d 437, 441–42 (4th Cir. 2016), *abrogated on other grounds by United States v. Stitt*, 139 S. Ct. 399 (2018); *United States v. Champion*, 609 F. App'x 122, 123 (4th Cir. 2015) (affirming district court's denial of a motion to suppress evidence of guns found in a vehicle because officer had probable cause to search after he smelled marijuana emanating from the vehicle, the driver's response to whether he had contraband in the car was "none that I know of," the driver said occupants had smoked marijuana in the vehicle, and the occupants gave inconsistent answers); *United States v. Lewis*, 606 F.3d 193, 198 (4th Cir. 2010) (finding probable cause justifying a vehicle search when an officer "smelled the odor of marijuana emanating from the vehicle"); *United States v. Carter*, 300 F.3d 415, 422 (4th Cir. 2002) (holding that an officer "clearly had probable cause to search the passenger compartment of [the] vehicle without a warrant, based on the burning marijuana he smelled as he approached the car"); *United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002) (holding that the smell of marijuana emanating from vehicle constituted probable cause to believe that marijuana was in the vehicle, justifying its search); *United States v. Cephas*, 254 F.3d 488, 495 (4th Cir. 2001) (recognizing that the strong smell of marijuana emanating from an open apartment door "almost certainly" provided the officer with probable cause to believe that marijuana was present in the apartment); *United States v. Haynie*, 637 F.2d 227, 233 (4th Cir. 1980) (holding odor of marijuana emanating from the back of a vehicle and seeing marijuana on the rear bumper and on the ground underneath established probable cause for the search of the trunk); *United States v. Sifuentes*, 504 F.2d 845, 848 (4th Cir. 1974) (holding that officers' sight of boxes inside a van coupled with the strong odor of marijuana permitted seizure of the boxes because they were in "plain view, that is, obvious to the senses").

In this case, as discussed above, Officer Wharton was qualified to detect the odor of marijuana, and he did detect it emanating from Parker as he was talking to Parker and before he told Parker that he could not leave the laundromat. Tr. at 24:4-10. Officer Wharton also testified that Parker was the only person in the laundromat, aside from Officer Wharton, at the time. Tr. at 18:22-19:2. This alone, under the case law discussed above, was probable cause for Officer Wharton to arrest Parker and search him incident to that arrest. *See DeFillippo*, 443 U.S. at 35. ("[A]n arresting officer may, without a warrant search a person validly arrested).

In addition, Parker's subsequent actions supported probable cause to arrest Parker— Parker admitted to smoking marijuana the prior day, the name he gave Officer Wharton did not come back to anyone in the police system, and he violently tried to escape detention after Officer Wharton told Parker he was going to search him. Ex 1. at 1:17; 2:55; 25:1-26:3; 4:36. The body worn camera does not show Parker attempting to take any clothes with him as he attempted to flee. While the odor alone was sufficient, these facts, in totality, also gave Officer Wharton probable cause to believe that Parker was trespassing and possessed marijuana. With probable cause to arrest, a search was also appropriate. *United States v. Han*, 74 F.3d 537, 541 (4th Cir. 1996) ("A search may be incident to a subsequent arrest if the officers have probable cause to arrest before the search.").

That Maryland law has decriminalized possession of less than ten grams of marijuana does not defeat probable cause to arrest based on the odor of marijuana because the federal determination of what constitutes probable cause to arrest for possession of marijuana in *Humphries* controls and, additionally, because possession of marijuana of any amount is still a federal crime. *See United States v. Bryant*, 36 F.3d 1094 (4th Cir. 1994) (holding that an arrest in violation of state law does not necessarily violate the Fourth Amendment); *cf. Street*

*v. Surdyka,* 492 F.2d 368, 371–72, 373 n. 7 (4th Cir. 1974) (holding violation of state law could not support civil rights violation claim if there was no federal law violation). In *United States v. Castillo Palacio*, 427 F. Supp. 3d 662, 672 (D. Md. 2019), Judge Chuang held that the odor of marijuana permitted the search of a vehicle and that "[t]he fact that possession of a small quantity of marijuana is now a civil violation in Maryland does not change this conclusion."

Further, if probable cause existed for violation of the federal crime of marijuana possession, there is no Fourth Amendment violation even if the state officer could not arrest the defendant for the federal crime. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause…. his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").

### 3. *Davis* precludes exclusion of the seized evidence if Maryland courts' interpretation of what constitutes probable cause controls.

The exclusionary rule "generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights," *Pennsylvania Bd. of Prob. & Parole v. Scott,* 524 U.S. 357, 359 (1998). However, the purpose of the rule "is to deter future Fourth Amendment violations," *Davis,* 564 U.S. at 236-37, and its application "properly has been restricted to those situations in which its remedial purpose is effectively advanced," *Illinois v. Krull,* 480 U.S. 340, 347 (1987). The exclusionary rule is not a "strict-liability regime," *Davis,* 564 U.S. at 240, and exclusion of evidence has "always been [the] last resort, not [the] first impulse." *Hudson v. Michigan,* 547 U.S. 586, 591 (2006). Where suppression fails to yield "appreciable deterrence," exclusion is "clearly ... unwarranted." *United States v. Janis*, 428 U.S. 433, 454 (1976). Understanding these principles, the Supreme Court held that the exclusionary

rule will not apply to suppress evidence where law enforcement officers acted in line with binding precedent at the time even is that precedent is later overruled. *Davis,* 564 U.S. at 229.[6]

Here, the Maryland Court of Special Appeals decided *Lewis*, 237 Md. App. at 661, on June 28, 2018. In that case, the court was confronted with the question of whether the odor of marijuana constituted probable cause to arrest an individual. In line with many other courts, including the Fourth Circuit, the Maryland Court of Special Appeals held: "consistent with authority in other jurisdictions, that the odor of marijuana, if localized to a particular person, provides probable cause to arrest that person for the crime of possession of marijuana." *Id.* at 683–84. Thus, the officer was permitted to arrest and search the defendant incident to that

---

[6]     The facts of *Davis* involved the search of a vehicle that was later determined to be unconstitutional but was in line with binding court precedent at the time of the search. There, Davis was a passenger in a car that the police pulled over. 564 U.S. at 235. He was eventually arrested for giving the police a false name. *Id.* While *Davis* was handcuffed and in the back of a police car, the police officer searched his jacket, which was still inside the car, and found a revolver in the pocket. *Id.* The trial court denied Davis's motion to suppress. *Id.* at 236. At the time of the search, the Eleventh Circuit (the circuit where the search was questioned) had interpreted the Supreme Court's decision in *New York v. Belton*, 453 U.S. 454, 455 (1981) to establish a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest. *Id.* at 235; *see also United States v. Gonzalez*, 71 F.3d 819, 826 (11th Cir. 1996). Not every court agreed with the Eleventh Circuit's reasoning, but it was binding precedent in that circuit. *Davis*, 564 U.S. at 233-34. The search incident to Davis' arrest was in line with the Eleventh Circuit decision in *Gonzalez*. *Id.* at 239. Then, while Davis' case was on appeal, the United States Supreme Court issued its opinion in *Arizona v. Gant*, holding that searches like the one in Davis's case (where he was restrained in the back of the police car and therefore couldn't reach the car where his jacket was found) were illegal because there was no reason for the officer to think that a search would find evidence related to his original arrest of giving a false name to the police. *Id.* at 234.

The Supreme Court held that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Id.* at 249-50. To find otherwise and suppress the evidence would not serve the purpose of the exclusionary rule, which is to deter violations of the Fourth Amendment. *Id.* If an officer's actions are in line with court precedent and therefore not in violation of the Fourth Amendment at the time of an arrest, there is no legitimate reason to exclude that evidence. *Id.* at 240-41. Thus, in *Davis*, even though *Gonzalez* had been overruled by the time of the appeal in *Davis*, it was binding precedent at the time of Davis' arrest and the evidence was not to be suppressed. *Id.* at 244.

arrest. *Id.* This was true even though the possession of ten grams or less of marijuana had been

decriminalized. *Id.* at 682. At the time Parker was arrested, *Lewis* was controlling precedent.[7]

    The holding in *Lewis* was subsequently overturned by the Court of Appeals after its

decision in *Pacheco v. State*, 465 Md. 311 (2019), which was decided on August 12, 2019.[8] But

Officer Wharton detected the odor of marijuana on Parker on March 20, 2019, when *Lewis* was

controlling law. Under *Davis*, even under Maryland's probable cause analysis, the exclusionary

rule should not apply to exclude the search of Parker because Officer Wharton's actions and

belief that he could stop and arrest Parker after he smelled marijuana emanating from him were

in compliance with binding Maryland court precedent at the time.

    **E. Parker's attempted flight before Officer Wharton could place him in handcuffs gave Officer Wharton probable cause to arrest Parker whether the initial stop was legal or illegal.**

    Officer Wharton told Parker that he was going to place him in handcuffs, search him, and

give him citations depending on what he found. Ex. 1 at 4:32. Before he could do so, Parker

attempted to flee. This flight and the actions Parker took to effectuate the attempted flight gave

Officer Wharton probable cause to arrest him not only for trespassing and possession of

---

[7] The decision was a reported decision and therefore binding court precedent in Maryland at the time of Parker's arrest in March 2019. *Archers Glen Partners, Inc. v. Garner*, 176 Md. App. 292, 325 (2007), *aff'd*, 405 Md. 43 (2008) (explaining that a reported decision by the Maryland Court of Special Appeals constitutes binding precedent, and an unreported decision does not, except as to the parties involved).

[8] In *Pacheco*, the Court of Appeals held that the police lacked probable cause to believe that the petitioner was in possession of more than 10 grams of marijuana where he was the driver and sole occupant of a vehicle that smelled of freshly burnt marijuana and contained a joint in the center console. In so holding, the court noted that there was no evidence "presented that addressed why [the petitioner's possession of] this minimal amount of marijuana, which is not a misdemeanor, but rather a civil offense, gave rise to a fair probability that [he] possessed a criminal amount of marijuana on his person." 465 Md. at 333.

marijuana, but also obstruction and assault. Even if Officer Wharton's initial stop of Parker had been in violation of the Fourth Amendment, which it was not, Parker's subsequent criminal actions gave rise to probable cause for arrest, permitting a valid search incident to arrest. *See DeFillippo*, 443 U.S. at 35. ("[A]n arresting officer may, without a warrant search a person validly arrested).

### 1. The initial stop was lawful and Parker's actions provided probable cause to arrest for additional crimes.

Parker's response to Officer Wharton's lawful stop constituted probable cause to arrest Parker additional crimes. For example, Maryland law makes it illegal to obstruct or hinder an officer in the performance of his or her duties. Md. Code, Crim. Law § 9-306.[9] In addition, Maryland law criminalizes an offensive physical contact that is the result of reckless conduct. Md. Code, Crim. Law § 3-203.[10] The Fourth Circuit has underscored this concept before. *See, e.g.*, *Karadi v. Jenkins*, 7 F. App'x 185, 196 (4th Cir. 2001) (granting summary judgment to the officer on a prior defendant's claim of unlawful arrest where officer was conducting a lawful *Terry* investigation of an individual when the individual committed obstruction under North Carolina law when she attempted to brush the officer's hand away multiple time); *United States v. Ruffin*, 2018 WL 1792128, at *4–5 (E.D.N.C. Apr. 16, 2018), *aff'd*, 814 F. App'x 741 (4th Cir. 2020) (finding officer had probable cause to arrest for obstructing when officer had lawfully

---

[9] The elements of obstructing or hindering an officer, in violation of Maryland law, are: (1) a police officer engaged in the performance of a duty; (2) an act, or perhaps an omission which obstructs or hinders the officer in performance of that duty; (3) knowledge by the accused of facts showing that the officer was engaged in performance of his duties; and (4) intent to obstruct or hinder the officer. *Cover v. State*, 297 Md. 398 (1983)

[10] The elements of assault, in violation of Maryland law, are: (1) defendant caused offensive physical contact with, or harm to, victim; (2) contact was result of intentional or reckless act of defendant and was not accidental; and (3) contact was not consented to by victim or was not legally justified. *Nicolas v. State*, 426 Md. 385, 403 (2012)

stopped individual and individual " "straightened his arm" to avoid being handcuffed and commenced a minutes-long struggle").  Here, Parker's attempted flight involved running into an officer and struggling to get free from the officers for some time.  These actions would have given Officer Wharton probable cause to arrest Parker under Maryland law for, at least, obstruction and assault. [11] This would permit a valid search incident to arrest, [12] and the evidence found on Parker should not be suppressed. *See DeFillippo*, 443 U.S. at 35. ("[A]n arresting officer may, without a warrant search a person validly arrested).

### 2. If the initial stop had not been lawful, Parker's subsequent actions still would have given Officer Wharton probable cause to arrest.

Even if Officer Wharton's initial stop of Parker had been in violation of the Fourth Amendment, Parker's subsequent actions would have given Officer Wharton probable cause to arrest. "If a suspect's response to an illegal stop is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime." *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (citing *United States v. Bailey,* 691 F.2d 1009, 1017 (11th Cir. 1982)).[13]  "A

---

[11] At least one Maryland court has found use of force during a *Terry* stop would constitute assault.  *See Riggins v. State*, 223 Md. App. 40, 60–61 (2015) (finding defendant was committing assault when officer was conducting *Terry* stop and the defendant tackled the officer and a struggle ensued).

[12] It does not matter for Fourth Amendment purposes whether Officer Wharton arrested Parker for these additional crimes. *See Devenpeck*, 543 U.S. at 153 ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause…. his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, 'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'").

[13] In *Bailey*, 691 F.2d at 1018–19, the Eleventh Circuit explained
> [i]f Danehy had no right to resist passively by 'going limp' and could be prosecuted under 18 U.S.C.A. s 111 for this, then a fortiori, Bailey had no right to flee and to strike Agent Markonni in an effort

contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Id.*[14]

In *United States v. Sprinkle*, officers saw a person, known to them as a convicted narcotics offender, sitting in the driver's side of a car in a high crime area. 106 F.3d at 615-17. Sprinkle, who the officers did not know, was in the passenger seat talking to the driver. *Id.* It looked like Sprinkle was passing something to the driver. *Id.* But the officer could see in the car and did not see any drugs or money. *Id.* One of the individuals did try to conceal his face. *Id.* The driver then drove away in a normal fashion, and the officers initiated a traffic stop. *Id.* Sprinkle exited the vehicle, and the officers told Sprinkle he was going to be pat down for weapons. *Id.* Sprinkle pushed away and ran. *Id.* He then drew a gun and shot at the officer. *Id.* Sprinkle was eventually persuaded to drop the gun and was arrested. *Id.*

The Fourth Circuit held what the officers saw in the car, the concealing of the face, and the driving away did not create reasonable suspicion that the two were engaging in criminal activity. *Id.* at 618-19. But, "[w]hen Sprinkle drew and fired his gun at the officer, he committed a new crime that was distinct from any crime he might have been suspected of at the time of the initial stop." *Id.* at 619. "The new crime purged the taint of the prior illegal stop." *Id.* at 618-19 (*citing Bailey,* 691 F.2d at 1012, 1018–19 (assuming that first arrest was illegal, second arrest

---

to escape Markonni's attempts to recapture him. Under Danehy, probable cause existed for Bailey's second arrest for resisting arrest and thus Agent Markonni could validly arrest Bailey. The search of Bailey that discovered the illicit drugs was a lawful search incident to the lawful second arrest.

[14] Many other courts agree with this principle. *United States v. King,* 724 F.2d 253 (1st Cir. 1984); *United States v. Remington,* 208 F.2d 567 (2d Cir. 1953); *United States v. Nooks,* 446 F.2d 1283 (5th Cir. 1971); *United States v. Dawdy,* 46 F.3d 1427 (8th Cir. 1995); *United States v. Udey,* 748 F.2d 1231 (8th Cir. 1984); *United States v. Garcia,* 516 F.2d 318 (9th Cir. 1975).

was legal because defendant, when caught after fleeing, struck DEA agent with his fists and tried to grab the agent's gun during ensuing struggle)) and *U.S. v. Crump*, 62 F. Supp. 2d 560, 568 (D. Conn. 1999) (citing cases standing for the proposition that violence against a police officer is an intervening illegal act). Because Sprinkle could have been arrested for this new crime, the Fourth Circuit held that evidence found as a result of the search incident to his arrest should not have been suppressed. *Id.* at 620; *see also United States v. Harvey*, 744 F. App'x 799, 801 (4th Cir. 2018) (finding that even if placing foot inside defendant's doorway was unlawful, defendant pulling gun was a new, distinct crime, and it purged the taint of any illegal entry and permitted the defendant's subsequent arrest); *Smith v. Wolfe*, 2017 WL 281993, at *7 (D. Md. Jan. 23, 2017) (Judge Blake held (in the context of reviewing a habeas petition) that "an individual may not *use force* to resist an illegal stop" such that "when [the defendant] pushed [the officer], he was not resisting an illegal arrest, as he claims, but rather, [the defendant] committed an assault, which gave the officers probable cause to arrest him.").[15]

In this case, before Officer Wharton could place Parker in handcuffs, Parker attempted to flee. He ran right into a second officer and both officers grab Parker by the coat. Ex 1. at 4:36. While the body worn camera is then obscured, it is clear that Parker is still attempting to flee and struggling with the officers. Ex. 1 at 4:48. Indeed, at one point, Parker's hands are seen swinging and hitting the officer as he is attempt to get off the ground. Ex. 1 at 5:08. Parker's actions

---

[15] Maryland courts have also held that an individual does not have the right to use force to resist an illegal stop, so the actions they take in doing so may be a new distinct crime. *See Hicks v. State,* 189 Md. App. 112, 125 (2009) (holding both that the officers had reasonable suspicion to stop the defendant and even if they did not, the defendant's attempt to swing at the officer and flee was a separate crime because he did not have the right to resist the stop); *Leatherberry v. State,* 4 Md. App. 300, 304 (1968) ("whether the officer's action in this case was proper…appellant's subsequent action in assaulting the officer was clearly unlawful and justified the subsequent arrest.").

would constitute probable cause to arrest him for assault. This would permit a valid search incident to arrest, and the evidence found on Parker should not be suppressed. *See DeFillippo*, 443 U.S. at 35. ("[A]n arresting officer may, without a warrant search a person validly arrested).

## <u>CONCLUSION</u>

Parker's motion to suppress the property recovered from his person incident to his arrest should be denied. Officer Wharton lawfully stopped Parker for trespassing and possession of marijuana. Officer Wharton was qualified to detect the odor of marijuana, and he did detect it emanating from Parker. That odor gave the officer probable cause to arrest Parker for possession of marijuana. Parker's subsequent actions supplied probable cause to arrest for trespassing, possession of marijuana, obstruction, and assault. Finally, and alternatively, Parker's attempted flight and struggle with officers provided probable cause to arrest for additional crimes even if the initial stop had been in violation of the Fourth Amendment. For all these reasons, the United States of America requests that the Court deny Parker's Motion to Suppress.