IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

    *Plaintiff*,

    v.

ELIJAH PARKER,

    *Defendant*.

Criminal Action No. ELH-19-0483

**MEMORANDUM OPINION**

Defendant Elijah Parker was indicted on the charge of unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  *See* ECF 1.  This Memorandum Opinion resolves his motion to suppress evidence.  ECF 16 ("Motion").  The government opposes the Motion.  ECF 30.

The Motion is rooted in events that occurred at the 4th Street Laundromat (the "Laundromat") in Frederick, Maryland during the early morning hours of March 20, 2019.  At the time, the Laundromat was open for business 24 hours a day, and the defendant was the only person inside the facility.  A police officer on rounds entered the Laundromat and saw the defendant, who was charging his cell phone.  He detained the defendant on suspicion of trespassing and because he detected the odor of marijuana emanating from the defendant.  After other officers arrived, a scuffle occurred and the defendant was subjected to pepper spray, for which he was later taken to the hospital.  The gun was recovered during a search of the defendant.

The Court held an evidentiary Motion hearing on September 22, 2020.[1]  The government

---

[1] Unfortunately, due to the COVID-19 pandemic, delays ensued in this case.  In addition, delay was occasioned by a change in defense counsel.  *See* ECF 20; ECF 24; ECF 25.

presented the testimony of Frederick City Police Officer Patrick Wharton; a video excerpt from the body camera worn by Officer Wharton, beginning at approximately 2:30 a.m. on March 20, 2019 (Government Exhibit 1); and a photograph of the interior of the Laundromat (Government Exhibit 2).  In addition, the defendant provided a transcription of the first few minutes of the audio from the body camera.  *See* ECF 16-1.[2]

Based on issues that surfaced at the Motion hearing, the parties submitted post-hearing briefing.  The government's supplemental brief is docketed at ECF 41, and the defendant's supplemental memorandum is found at ECF 42.  The government's reply is docketed at ECF 52. In addition, the transcript of the Motion hearing is docketed at ECF 40.  The Court held a second Motion hearing on January 12, 2021, at which oral argument was presented.[3]

As I untangle the issues, I am mindful of a fundamental precept in our system of justice: "The end does not justify the means."  Therefore, the detention of the defendant cannot be deemed lawful merely because the police recovered the gun.  I am also aware that, given the defendant's seemingly benign conduct in charging his cell phone, some might question why the officer pursued the defendant, instead of merely instructing him to vacate the premises.  Others might conclude that the officer engaged in solid police work.  But, the Court is not tasked with deciding that matter.  The only question that I must resolve is this:  Did Officer Wharton act lawfully?  Regardless of one's view as to the officer's conduct, Mr. Parker surely experienced the quintessential "Terrible, Horrible, No Good, Very Bad Day."[4]

---

[2] Counsel for both parties have indicated that the transcription is largely accurate and they had no objection to the Court's consideration or use of it.

[3] Due to the COVID-19 pandemic, and because the second hearing was limited to oral argument, it was conducted by video.  At this juncture, I do not have a transcript of the second hearing.

[4] *See* Judith Viorst, *Alexander and the Terrible, Horrible, No Good, Very Bad Day*.

## I. Factual Summary

In March 2019, Officer Wharton was a Frederick City patrol officer assigned to the midnight shift.  ECF 40 at 7.  As of September 2020, he had been a Frederick City police officer for about seven years.  *Id.* at 6.  Also as of September 2020, Wharton had arrested about ten people for trespassing, all at the Laundromat.  *Id.* at 8, 11-12.[5]  And, he had arrested about 30 people after smelling marijuana on them.  *Id.* at 8.

At the relevant time, the Laundromat was open to the public "24/7."  *Id.*; *see id.* at 17.  There are about 25 washing machines and 8 to 10 dryers at the facility.  *Id*. at 12.  Wharton testified, *id.* at 9:  "The doors are unlocked.  People can do laundry whenever."  Notably, there are no employees on duty during the late night/early morning hours.  But, the facility has "a camera system."  *Id.*

Wharton explained that the owner of the Laundromat had asked the police department to assist with trespassers.  *Id.* at 8-9.  To the extent the police received complaints about trespassers, the complaints concerned the period from midnight to 5:00 a.m., when Wharton was generally on duty.  *Id.* at 17.

On the date in question, at approximately 2:30 a.m., Officer Wharton was in the vicinity of the Laundromat, and decided to do "a patrol check."  ECF 40 at 16.  He was in uniform.  *Id.* at 17-18.  Wharton did not know that anyone was inside the Laundromat when he entered the facility.  *Id.* at 16-17.  Rather, the officer first saw the defendant only after the officer entered the facility.

There is no sign posted on the entrance to the Laundromat that warns against trespassing.  *Id.* at 10, 16.  But, the front of the facility has "multiple windows," and the officer claimed:

---

[5] Officer Wharton testified to his experience as of September 2020, not as of March 2019.

"You can clearly see in it." *Id.* at 16.  And, there is a sign inside, advising that trespassing is not

permitted. *Id.* at 10.  It is located in a fairly prominent place, in the center of the facility, next to a

flat screen television hanging on a wall. *Id.*; *see* Government Ex. 2.

According to Wharton, the sign is visible as you enter the facility.  ECF 40 at 10.  The

sign says:  "No trespassing.  If you're not doing laundry, you're Trespassing." *Id.* at 11;

Government Ex. 2.  The words "No Trespassing" are in red block letters against a black

background.  The rest of the message appears to be handwritten.  Government Ex. 2.

When Officer Wharton entered the facility, he saw the defendant, standing at a counter,

charging his cell phone. *Id.* at 13, 18-21.  The defendant was the only person inside the

Laundromat at the time. *Id.* at 18-19.  He had on what looked like a book bag or backpack, not

particularly large.  Government Exhibit 1; ECF 40 at 22; *see also id.* at 33.

Wharton suspected that the defendant was trespassing. *Id.* at 22, 23, 33.  He explained

that, to determine if someone is trespassing while in the Laundromat, he looks to see if "any

laundry is actually being done." *Id.* at 12.  He also listens to see if he "can hear" a laundry

machine. *Id.*  Wharton described the equipment as "loud." *Id.* at 18.  The officer testified:  "If

someone is doing laundry, you'd be able to hear it." *Id.*  At the time, he "didn't see anything

spinning . . . ." *Id.* at 17.  Wharton was also "listening to see if [he could] hear any laundry." *Id.*

at 18.  He reiterated, *id.*:  "I did not see or hear any laundry being done at all . . . ."  Nor did he

see any laundry "piled up" around the defendant at the counter. *Id.* at 17; *see also id.* at 19.

Officer Wharton could not have known, merely from seeing the defendant standing at the

counter, charging his phone, whether or not he had recently finished his laundry.  But, he asked

Parker if he was doing laundry. *Id.* at 22.  Parker responded:  "I was.  Something in the dryer."

ECF 16-1 at 2; *see* ECF 40 at 23, 30.  The officer asked:  "Is it in there now?"  ECF 16-1 at 2;

*see* ECF 40 at 22.  The defendant responded:  "No, it's done.  Finishing charging my phone."  ECF 16-1 at 2.  The officer then said, ECF 16-1 at 2:  "You got any I.D. on you?"  Defendant responded, "No, I don't."  *Id.*, ECF 40 at 242.  At about the same time, at about one minute 19 seconds into the video, Wharton contacted dispatch, asking for assistance from another unit.  ECF 40 at 23; ECF 16-1 at 2.

The video indicates that the defendant was attempting to leave the Laundromat.  ECF 40 at 23-24.  Wharton testified that, as the defendant tried to exit, he told the defendant "he was not free to go . . . ."  ECF 40 at 24.  According to the transcription, Wharton said:  "Hey, man, you can't go right now.  I'm going to need an I.D.  You are not allowed to be in here.  You are actually trespassing right now."  ECF 16-1 at 2.  The defendant responded that he "was doing laundry."  *Id.*  Wharton answered:  "You're not doing laundry right now . . . .  This is your word against . . . ."  Parker interjected:  "I was done.  I'm just done."  *Id.*  The officer then said:  "And I smell weed emanating from you right now, as well."  *Id.*; *see also* ECF 40 at 24.  Notably, the officer testified that he smelled the marijuana "as [he] was talking to" Parker, but "before" Wharton told Parker to stop.  ECF 40 at 24.  Wharton added:  "I could smell it before."  *Id.*  Later, Wharton claimed he smelled the marijuana when he entered the Laundromat.  *Id.* at 35.

In my view, the interaction between Parker and Wharton demonstrates that Parker was not intimidated by Wharton.  After Wharton told the defendant that he smelled marijuana, Parker disputed the assertion, stating:  "You don't."  ECF 16-1 at 2.  However, Parker admitted that he had smoked weed "yesterday," but he again challenged Wharton's claim that Wharton could smell it.  *Id.* at 2-3.

Parker also maintained that he had no weed on him.  *Id.* at 3.  Wharton answered:  "It doesn't matter.  I can still smell it on you."  *Id.*  Further, the officer said, *id.*:  "Well, I do smell it

from you so I'm going to need to see some I.D. on you.  You have nothing."

At that point, Wharton asked the defendant for his full name and date of birth.  *Id.*  Parker identified himself as Gary Charles Dorsey, and he provided a date of birth.  *Id.*; *see* ECF 40 at 25.  The defendant again said he was "just charging [his] phone."  ECF 16-1 at 4.  The officer responded, *id.*: "I come in here, you are not doing laundry."  Parker persisted, stating, *id.*: "I'm done."  The officer answered:  "All I see is you charging your phone.  And you smell like weed." *Id.* at 4.  The defendant responded, "Anybody can say that."  *Id.*  Parker reiterated: "I smoked weed yesterday."  *Id.*

Wharton also asked Parker if he had provided "a fake name."  ECF 16-1 at 4.  Parker denied that he had done so.  *Id.*  But, he indicated that he had no address, however.  *Id.* at 5. Wharton again asked if the defendant had anything with his name on it, and defendant said: "No.  Can't help it.  I just want to get out now."  *Id.*

Wharton told Parker he could take a seat.  *Id.*  Then, he checked with dispatch on the status of another unit.  *Id.*  Wharton also instructed Parker to remove his backpack and place it on the table.  *Id.* at 6.  Parker asked, "What have I done wrong[?]"  *Id.*  Wharton said, *id.*:  "Again, you are trespassing and I smell weed coming from you."  Parker responded:  "I didn't do anything wrong, sir."  *Id.*

Then, Wharton told Parker that he would "be placed in handcuffs . . . ."  *Id.*  Parker asked "Why?"  *Id.*  Wharton responded, *id.*:  "For smelling like wee[d] . . . . And like I said, you were also trespassing."  *Id.*  Again, Parker denied that he was trespassing.  *Id.*  At that point, Wharton said, *id.*:  "So, I'm going to put you in cuffs and search you."  *Id.*  He explained that if Parker did not have any marijuana on him, "there will be some citations I'll give you . . . ."  *Id.*

At that point, other officers arrived and a scuffle ensued, apparently as the officers sought

to handcuff the defendant.  It is not entirely clear whether defendant had attempted to flee, resisted arrest, or both.  But, according to the transcription, one officer told the defendant to "[g]et down" and to "stop resisting."  *Id.* at 7.  Another threatened to tase Parker.  *Id.*  The government has indicated that Parker was pepper-sprayed.  He was also searched, and the firearm that is the subject of the Motion was recovered at that time.

As noted, Wharton believed that he had reasonable, articulable suspicion to detain the defendant on suspicion of trespassing.  ECF 40 at 33-34.  Wharton claimed he would not have charged the defendant if he had finished his laundry, but the defendant "was trying to leave" before the officer could continue to talk.  *Id*. at 34-35.  Further, Wharton explained that there was no point in looking for clothes in a machine because the defendant had said he was done with his laundry.  *Id.* at 31.  Nor did the officer ask the defendant which dryer he had used, so that he could check to see if a dryer was warm as a result of recent use.  *Id*. at 30.

Wharton stated that he intended to search the defendant's book bag "regardless," based on the smell of marijuana.  *Id.* at 35, 40, 41.  But, the officer testified that he did not ask to look in the defendant's book bag to check for laundry because he "knew for a fact [he] was going to place [the defendant] in cuffs and search him because [he] smelled marijuana."  *Id.* at 41.  And, he acknowledged that the search would have enabled him to verify if the defendant was really doing laundry.  *Id*. at 40, 41.  According to Wharton, he was "biding time," waiting for back up.  *Id*. at 26.  He added, *id.* at 41:  "I was just waiting for another officer."

## II.  The Contentions

The defendant argues that he was seized almost immediately by Wharton, when Wharton asked him questions to further his investigation.  ECF 40 at 91-92; ECF 42 at 2.  And, the defense maintains that there was no basis to detain the defendant because the defendant's laundry

could have been in his backpack, and Wharton made no attempt to see if a dryer had been used recently.  ECF 40 at 98-99.  In his view, the lack of visible clothes did not add to the analysis.  *Id.* at 99.  Noting that Maryland law has been "unsettled" in regard to the matter of possession of marijuana, *id.* at 96, the defendant also argues that there was no basis to justify an arrest on this ground.  *Id.* at 93, 96.  In addition, Parker challenges the credibility of Wharton in claiming he smelled marijuana emanating from the defendant.

According to the government, a seizure occurred under the Fourth Amendment when Wharton told the defendant he could not leave the Laundromat.  ECF 40 at 58; ECF 41 at 7.  At that point, argues the government, Officer Wharton had reasonable, articulable suspicion to stop the defendant for trespassing, and probable cause to arrest him based on the smell of marijuana emanating from the defendant.  ECF 40 at 53, 57, 75, 76; ECF 41 at 7.[6]

Based on the totality of the circumstances, including the time of day, the fact that no laundry equipment was in operation, the officer's experience, the posted No Trespassing sign, the defendant's conduct in charging his phone, and the defendant's assertion that he had just done his laundry, with no clothes in sight, the government insists that Wharton had a legal basis to detain the defendant for trespassing.  ECF 40 at 59-63.  And, based on federal law, as well as Maryland law in effect in March 2019, the government maintains that Wharton had probable cause to arrest the defendant based on the odor of marijuana coming from him.  In this regard, the government acknowledges that this Court "would have to credit Officer Wharton's testimony" concerning the smell of marijuana and when he smelled it.  *Id.* at 74.

---

[6] The government concedes that Wharton did not smell marijuana when he entered the Laundromat.  ECF 40 at 54.  But, as noted, at one point, Wharton said he smelled marijuana when he "entered the facility and [he] could smell it on him.  *Id.* at 35.

### III. Discussion

### A.

The Fourth Amendment to the Constitution guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It protects against unreasonable searches and seizures. *Utah v. Strieff*, _____ U.S. _____, 136 S. Ct. 2056, 2060 (2016); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). However, by its plain text, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see Illinois v. Rodriguez,* 497 U.S. 177, 183-84 (1990); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Mendenhall*, 446 U.S. at 551.

"'[T]he ultimate touchstone of the Fourth Amendment is reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (citation and some quotation marks omitted); *see Fernandez v. Calif.*, 571 U.S. 292, 298 (2014); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Maryland v. Wilson*, 519 U.S. 408, 411 (1997); *Jimeno*, 500 U.S. at 250; *United States v. Lyles*, 910 F.3d 787, 795 (4th Cir. 2018); *United States v. Sowards*, 690 F.3d 583, 588 (4th Cir. 2012). The "test of reasonableness under the Fourth Amendment is an objective one." *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Reasonableness is determined by balancing "the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Maryland v. Buie*, 494 U.S. 325, 331 (1990); *see Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam) ("Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'") (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). As the Fourth Circuit has

said:  "The magnitude of the intrusion relative to the seriousness of any offense 'is of central

relevance to determining reasonableness[.]'"  *Lyles*, 910 F.3d at 796 (quoting *Maryland v. King*,

569 U.S. 435, 446 (2013)).

Warrantless searches, *i.e.,* those "conducted outside the judicial process," without prior

approval by a judge or a magistrate, are per se unreasonable unless the search falls within a valid

exception to the warrant requirement.  *See Kentucky v. King*, 563 U.S. 452, 459-60 (2011);

*Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993); *Katz v. United States*, 389 U.S. 347, 357

(1967).  The government bears the burden of proving, by a preponderance of the evidence, that a

valid exception applies.  *United States v. Gwinn*, 219 F.3d 316, 335 (4th Cir. 2000).

*Santos v. Frederick County Bd. of Com'rs*, 725 F.3d 451 (4th Cir. 2013), is instructive.

In *Santos*, the Fourth Circuit summarized "three categories of police-citizen encounters," *id.* at

460-61:

> First, "consensual" encounters, the least intrusive type of police-citizen
> interaction, do not constitute seizures and, therefore, do not implicate Fourth
> Amendment protections.  *Florida v. Bostick*, 501 U.S. 429, 434[] (1991).  Second,
> brief investigative detentions—commonly referred to as "*Terry* stops"—require
> reasonable, articulable suspicion of criminal activity.  *Terry* [*v. Ohio*, 392 U.S. 1,
> 21 (1968)].  Finally, arrests, the most intrusive type of police-citizen encounter,
> must be supported by probable cause.  *Devenpeck v. Alford*, 543 U.S. 146, 152[]
> (2006).
>
> A police-citizen encounter rises to the level of a Fourth Amendment
> seizure when "the officer, by means of physical force or show of authority, has in
> some way restrained the liberty of a citizen . . . ."  *United States v. Jones*, 678
> F.3d 293, 299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16 [ ]).  This
> inquiry is objective, [*United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002)],
> asking whether "'in view of all of the circumstances surrounding the incident, a
> reasonable person would have believed that he was not free to leave.'"  *Jones*, 678
> F.3d at 299 (quoting [*United States v. Mendenhall*, 446 U.S. 544, 554 (1980))].
> An encounter generally remains consensual when, for example, police officers
> engage an individual in routine questioning in a public place.  *United States v.*

*Gray*, 883 F.2d 320, 323 (1989); *see also Bostick*, 501 U.S. at 434[ ] ("[M]ere police questioning does not constitute a seizure.").

Thus, as *Santos* indicates, not every contact between police and an individual constitutes a seizure that implicates the Fourth Amendment. An encounter may be consensual, for which no justification is needed. *See United States v. Jones,* 678 F.3d 293, 299 (4th Cir. 2012).

Of import here, "mere police questioning does not constitute a seizure." *Muehler v. Mena*, 544 U.S. 93, 101 (2005). The Fourth Amendment is not implicated in a police-citizen encounter in which a law enforcement officer approaches someone on the street or in a public place to ask a few questions or for identification. *United States v. Drayton*, 536 U.S. 194, 200-01 (2002); *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Mendenhall*, 446 U.S. at 555; *see also United States v. Lewis*, 606 F.3d 193, 197-98 (4th Cir. 2010); *United States v. Black*, 525 F.3d 359, 364 (4th Cir. 2008), *cert. denied*, 555 U.S. 875 (2008); *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002). "So long as a reasonable person would feel free 'to disregard the police and go about his business' . . . the encounter is consensual." *Bostick*, 501 U.S. at 434 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)); *see also Jones,* 678 F.3d at 299; *United States v. Ward*, 482 Fed. App'x 771, 772-73 (4th Cir. 2012); *United States v. Analla,* 975 F.2d 119, 124-25 (4th Cir. 1992); *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989).

A seizure occurs for purposes of the Fourth Amendment "when the officer, 'by means of physical force or show of authority,' terminates or restrains" the suspect's "freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations and some quotation marks omitted); *see Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *Jones*, 678 F.3d at 299. Put another way, "a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed

that he was not free to leave." *Mendenhall*, 446 U.S. at 554-55; *see Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

The reasonable person standard "is an objective one" and "its proper application is a question of law." *Weaver*, 282 F.3d at 309. The motive of the police in making the stop is irrelevant. *Whren v. United States*, 517 U.S. 810, 813 (1996). A court must consider all the circumstances to determine whether the police conduct would have communicated to a reasonable person that he or she was not free to leave or to terminate the encounter. *Bostick*, 501 U.S. at 439; *Jones*, 678 F.3d at 299.

To determine if a reasonable person would have felt free to leave, courts consider several factors. These include the time, place and purpose of the encounter; the number of police officers at the scene; whether they are in uniform; whether the police displayed weapons; whether they touched the defendant or attempted to restrain his movement; their tone of voice and demeanor; whether the officer informed the defendant that he was suspected of illegal activity; and whether any requested identification was promptly returned. *See United States v. Black*, 707 F.3d 531, 537-38 (4th Cir. 2013); *Jones*, 678 F.3d at 299-300.

The cases cited above support the conclusion that, when Officer Wharton approached the defendant at the counter in the Laundromat and asked him whether he was doing laundry, and then asked him for his identification, the Fourth Amendment was not yet implicated. However, when Officer Wharton told the defendant that he could not leave the Laundromat, a seizure clearly occurred within the ambit of the Fourth Amendment.

**B.**

What has become known as the "*Terry* stop and frisk" is one of the limited exceptions to the warrant requirement. *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the Supreme Court

recognized that even a brief investigatory police stop constitutes a seizure under the Fourth Amendment because it "restrains" a person's "freedom" and is a "serious intrusion upon the sanctity of the person . . . ." *Id.* at 16, 26, 17.  But, in *Terry*, 392 U.S. at 21, and the companion case of *Sibron v. New York*, 392 U.S. 40 (1968), the Supreme Court ruled that a police officer may stop a person and temporarily detain an individual when the officer has "specific and articulable facts which, taken together with rational inferences from those facts," create reasonable suspicion that the person has been or is about to engage in criminal activity.  *See United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause . . . .").

The purpose of a *Terry* stop is investigative—to verify or to dispel the officer's suspicion surrounding the suspect.  *Terry*, 392 U.S. at 22-23, 30.  When an officer has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" the officer may detain an individual for a brief period of time in order to resolve the suspicion.  *Sokolow*, 490 U.S. at 2 (1989) (quoting *Terry*, 392 U.S. at 30); *see Ornelas v. United States*, 517 U.S. 690, 696 (1996) (describing reasonable suspicion as "'a particularized and objective basis' for suspecting the person stopped of criminal activity") (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)); *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011); *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010), *cert. denied*, 565 U.S. 914 (2011).

But, it is well settled that the stop must be "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  *Cortez*, 449 U.S. at 417. In other words, even a "brief" investigatory stop "must be supported at least by a reasonable and

articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980); *see Arvizu*, 434 U.S. at 273; *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011); *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011).

Reasonable, articulable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity. . . ." *Ornelas*, 517 U.S. at 696;  *see Kansas v. Glover*, ___ U.S. ___, 140 S. Ct. 1183, 1188 (2020); *Navarette v. California,* 572 U.S. 393, 396-97 (2014); *United States v. Feliciana*, 974 F.3d 519, 523 (4th Cir. 2020); *United States v. Gardner*, 823 F.3d 793, 799 (4th Cir. 2016); *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015); *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2014); *Black,* 707 F.3d at 539; *Massenburg*, 654 F.3d at 486; *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009).  It "is demonstrated when an officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity."  *Ortiz*, 669 F.3d at 444 (internal quotations omitted); *see also Alabama v. White*, 496 U.S. 325, 329-30 (1990); *Feliciana*, 974 F.3d at 523.  If an officer lacks reasonable suspicion, the Fourth Amendment permits the person to refuse to "answer any question put to him" and he "may go on his way."  *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality opinion); *see United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013).

The reasonable suspicion standard is not onerous.  *See*, *e.g.*, *United States v. Glover*, 662 F.3d 694, 698-700 (4th Cir. 2011).  It "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but some "minimal level of objective justification [is required] for making the stop."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see Glover*, 140 S. Ct. at 1188; *Navarette*, 572 U.S. at 397; *Sokolow*, 490 U.S.

at 7; *United States v. Lawing,* 703 F. 3d 229, 236 (4th Cir. 2012), *cert. denied*, 569 U.S. 940 (2013); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000).  However, mere presence in a high crime area is not enough.  *Wardlow*, 528 U.S. at 124.

To be sure, the question of reasonable, articulable suspicion is sometimes elusive.  The Supreme Court has long acknowledged the difficulty in pinpointing exactly what constitutes articulable suspicion.   *Ornelas*, 517 U.S. at 699-700.   But, "the detaining officer [must] '. . . either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.'"   *Williams*, 808 F.3d at 246 (citation omitted); *see Mason*, 628 F.3d at 128.

The standard "'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.'"   *Glover*, 140 S.  Ct. at 1188 (citations omitted) (emphasis added in *Glover*).  Moreover, officers must be permitted to make "'commonsense judgments and inferences about human behavior.'"   *Id.* (citation omitted); *see Navarette*, 572 U.S. at 404.

In assessing reasonable suspicion, courts "give due weight to commonsense judgments reached by officers in light of their experience and training."  *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see United States v. McBride*, 676 F.3d 385 (4th Cir. 2012); *Sowards*, 690 F.3d at 587-88; *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010); *United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008); *cert. denied*, 555 U.S. 1118 (2009).  As the Fourth Circuit recently reiterated in *Feliciana*, 974 F.3d at 525:  "Officers often base their suspicion in part on their practical experience and specialized knowledge, which we credit when assessing the constitutionality of their actions."   *Id.* at 525.   However, because the reasonable suspicion

standard is an objective one, the officer's subjective state of mind is of no moment.  *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011).

Further, reasonable suspicion is determined by examining the totality of the circumstances.  *See Wardlow*, 528 U.S. at 123; *Sokolow*, 490 U.S. at 7-8; *Jones*, 678 F.3d at 299. "A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect."  *George*, 732 F.3d at 299 (citing *Wardlow*, 528 U.S. at 124).  And, "multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient." *George*, 732 F.3d at 300.  So, "reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation."  *United States v. McCoy*, 513 F.3d 405, 413-14 (4th Cir. 2008) (citing *Arvizu*, 534 U.S. at 277-78).

The government relies, *inter alia*, on *United States v. Bumpers*, 705 F.3d 168 (4th Cir. 2013), to support its contention that Officer Wharton had reasonable, articulable suspicion to detain the defendant for trespassing.  The facts in *Bumpers* are altogether different.

In *Bumpers*, at about 7:30 p.m., the defendant and another person were standing near garbage dumpsters in a parking lot of a convenience store in a high crime area, and there was a no trespassing sign.  They were not near the entrance to the store and had no items suggesting a recent purchase.  The men began to walk away as soon as they saw the officer, with no attempt by them to enter the store.  Based on suspicion of trespassing, the officer told the men that they were not free to go and asked for identification.  The defendant complied.  He initially gave a false first name and then his actual name.  A records check revealed an active warrant.  A search incident to his arrest revealed a handgun.

In a two to one decision, the panel majority upheld the stop.  It pointed to the location of the encounter in a high crime area as well as "the particular location and manner" in which the men were standing, *i.e.*, at garbage dumpsters, not close to the store's entrance, which was "not a natural spot for customers to be just standing around."  *Id.* at 175.  And, there was no indication that the individuals were lawful patrons of the store.  *Id.*   The Court also pointed to the defendant's evasive behavior when he saw the officer, walking away at a fast pace.  *Id.*  The "attempt to dodge" the police and "quickly vacate the premises" was conduct consistent with that of a trespasser. *Id.* at 176.

The facts here are not like those in *Bumpers.*  The defendant was not loitering outside. Under Maryland law, a business invitee is one who is invited or permitted to enter another's property for purposes related to the owner's business.  *See*, *e.g.*, *Norris v. Ross Stores, Inc.*, 159 Md. App. 323, 334, 859 A.2d 266, 273 (2004).  The defendant was inside a place open to the public for business, and he was engaged in the rather innocuous act of charging his cell phone. There was no indication that the facility was in a high crime area.

Moreover, contrary to the government's suggestion, the hour of the day – 2:30 a.m. – was not suspicious.  The business operated 24 hours a day, and many people have to work at off hours.  Indeed, the Fourth Circuit has repeatedly "admonished against the Government's misuse of innocent facts as indicia of suspicious activity."  *Black*, 707 F.3d at 538; *see Powell*, 666 F.3d at 182-83; *United States v. DiGiovanni,* 650 F.3d 498, 512 (4th Cir. 2011); *Foster,* 564 F.3d at 248.

On the other hand, the owner of the Laundromat had previously asked the police for assistance with trespassers during the period after midnight.  And, there was a conspicuous "No Trespassing" sign posted inside the Laundromat.  Md. Code (2012 Repl. Vol.), § 6-402(a)(1) of

the Criminal Law Article ("C.L.") provides:   "a) *Prohibited*. – A person may not enter or trespass on property that is posted conspicuously against trespass by: 1) signs placed where they reasonably may be seen."   In Maryland, the law prohibits a person from entering or trespassing on property that is "posted conspiculously against trespass . . . ." *Jones v. State*, 194 Md. App. 110, 131; 3 A.3d 465, 477 (2010).

Officer Wharton could not conclude, merely from seeing the defendant inside the Laundromat, charging his cell phone, that he was necessarily trespassing, in violation of C.L. § 6-402(a).   But, the officer was categorical in his testimony that no laundry or dryer machines were in use, nor did he see any laundry.   He also had the right to talk to the defendant, which he did.   The officer asked Parker if he was doing his laundry, and Parker responded to the effect that he had used a dryer but was done and was merely charging his phone.   Although the officer did not seek to verify whether a dryer felt warm, indicative of recent use, this is not dispositive.[7] Notably, "a reasonable suspicion need not rule out all innocent explanations[.]"   *Black*, 525 F.3d at 365.

Moreover, the incident occurred at 2:30 a.m.   Although that time is not significant in isolation, the officer was aware that it corresponded to the period of time for which the police had received complaints about trespassers at the Laundromat.   And, Officer Wharton had previously found several trespassers in the facility during his midnight shift.

On these facts, I conclude that the officer had reasonable, articulable suspicion to detain the defendant on suspicion of trespassing.   And, as discussed next, the officer had additional grounds to support his conduct.

---

[7] The video indicates that the satchel was not particularly large, and it certainly did not look like it had laundry in it.

### C.

As the video reflects, at the relevant time, the officer stood quite near the defendant. Wharton testified that he smelled marijuana on the defendant.  At that point in time, Maryland law provided that the smell of marijuana could give rise to probable cause for an arrest if the officer could link the source of the odor to a particular individual.

Probable cause for an arrest "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Illinois v. Gates*, 462 U.S. 213, 243-44, n.13 (1983); *see District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 586 (2018).  As to an arrest, "[p]robable cause is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'"  *Ortiz*, 669 F.3d at 444 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

The assessment of probable cause is based on the totality of the relevant circumstances, "rather than on the technical or rigid demands of a formulaic legal test."  *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011); *see United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019).  Notably, "officers may draw conclusions from their experience, judgment, and observations when identifying the place to be searched."  *United States v. Wienke*, 733 F.3d. App'x 65, 69-70 (4th Cir. 2018).

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court reiterated, *id.* at 370-71 (citations and internal quotation marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.  Probable cause is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.  We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

*See also Wesby*, ___ U.S. ___, 138 S. Ct. at 586; *Gates*, 462 U.S. at 239.

Effective October 1, 2014, the Maryland General Assembly decriminalized possession of less than ten grams of marijuana.  *See* Maryland Code (2012 Repl. Vol., 2014 Supp.), Criminal Law Article § 5-601(c)(2).  Possession of such a quantity is now a civil offense, for which a police officer shall issue a citation upon probable cause.  *See Norman v. State*, 452 Md. 373, 156 A.2d 940, *cert. denied*, 138 S. Ct. 174 (2017); *Robinson v. State*, 451 Md. 94, 152 A.3d 661 (2017).  But, it was not until August 12, 2019, *i.e.*, after the events here, that the Maryland Court of Appeals determined that the mere odor of marijuana does not create probable cause to believe a person possesses a criminal amount of marijuana.  *Pacheco v. State*, 465 Md. 311, 214 A.3d 505 (2019).

In *Lewis v. State*, 237 Md. App. 661, 187 A.3d 771 (2018), a divided panel of the Maryland Court of Special Appeals held that the odor of marijuana provided probable cause to arrest for possession of marijuana if the officer smells the odor of marijuana under circumstances in which the officer can localize the source of the smell to a particular person.  *Id.* at 683, 187 A.3d at 784.

Thereafter, in August 2019, the Maryland Court of Appeals decided *Pacheco*, 465 Md. 311, 214 A.3d 505.  In that case, the Maryland Court of Appeals determined that the odor of marijuana in a vehicle does not give rise to probable cause to believe that the defendant was in possession of a criminal amount of marijuana.  *Id.*; *see also Norman v. State*, 452 Md. 373, 156

A.3d 940 (2017) (concluding that police lacked reasonable suspicion to frisk the defendant, who was a passenger in a vehicle, based on odor of marijuana coming from the vehicle); *Robinson v. State*, 451 Md. 94, 152 A.3d 661 (2017) (concluding that police had probable cause to conduct warrantless vehicle searches based on odor of marijuana, notwithstanding decriminalization of possession of less than ten grams).

Then, in July 2020, the Maryland Court of Appeals reversed the decision of the Court of Special Appeals in *Lewis*.  *See Lewis v. State*, 470 Md. 1, 233 A.3d 86 (2020).  The Maryland Court of Appeals expressly held in *Lewis* "that the mere odor of marijuana emanating from a person, without more, does not provide the police with probable cause to support an arrest . . . ." *Id.* at 27, 233 A.3d at 101.

However, as of March 2019, the decision of the Court of Special Appeals in *Lewis*, 237 Md. App. 661, 187 A.3d 771, constituted binding appellate precedent in Maryland.  *See Archers Glen Partners, Inc. v. Garner*, 176 Md. App. 292, 325, 933 A.2d 405, 424 (2007) (explaining that a "reported decision" of the Maryland Court of Special Appeals "constitutes binding precedent").  And, the case of *Davis v. United States*, 564 U.S. 229 (2011), makes clear that the exclusionary rule does not apply when the police act "in objectively reasonable reliance on binding judicial precedent."  *Id.* at 239.  Thus, at the time that Wharton relied on the smell of marijuana to detain the defendant, Maryland law established probable cause for an arrest of a person outside of a vehicle if, as here, the odor could be linked to a particular individual.

Moreover, notwithstanding Maryland's decriminalization of possession of small quantities of marijuana, federal law continues to render it illegal to possess marijuana.  21 U.S.C. § 844; *see United States v. Humphries*, 372 F.3d 653 (4th Cir. 2004); *see also United States v. Castillo Palacio*, 427 F. Supp. 3d 662, 672 (D. Md. 2019) (upholding vehicle search based on

odor of marijuana, despite the fact that personal possession of a small quantity is a civil offense in Maryland).

In *Lewis*, the panel majority for the Court of Special Appeals relied, *inter alia*, on *Humphries*, 372 F.3d 653.  *See Lewis*, 237 Md. App. At 678, 187 A.3d at 781. In *Humphries*, the Fourth Circuit stated, 372 F.3d at 658:  "We have repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place."  It added, *id.* at 659:  "While the odor of marijuana provides probable cause to believe that marijuana is present, the presence of marijuana does not of itself authorize the police either to search any place or to arrest any person in the vicinity.  Additional factors must be present to localize the presence of marijuana such that its placement will justify either the search or the arrest."

Similarly, the Fourth Circuit has concluded that the smell of marijuana linked to a vehicle provides probable cause to search the vehicle.  *See United States v. Richardson*, 801 F. App'x 157, 158 (4th Cir. 2020); *United States v. Champion*, 609 F. App'x 122, 123 (4th Cir. 2015); *United States v. Lewis*, 606 F.3d 193, 198 (4th Cir. 2010); *United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002).

Wharton testified under oath that he smelled the odor of marijuana coming from the defendant.  He was in close proximity to the defendant at that time, and the defendant was the only person in the Laundromat, other than Wharton.  Moreover, the defendant admitted that he had smoked marijuana the day before, although he denied he had any with him, and none was recovered.

The officer described his training as to drug identification, and his prior experience in arresting people for possession of marijuana.  *See United States v. McCaster*, 466 Fed. App'x

443, 446 (6th Cir. 2011) (deferring to district court's credibility determination and stating: "We further note that this circuit has never required an officer claiming to have smelled burnt marijuana – a common and distinctive odor – to show he had particular training and experience in detecting marijuana."). Moreover, Wharton maintained that he smelled the marijuana on the defendant before ordering him to stop. Nor is there any evidence suggesting that the odor necessarily would have dissipated in a day, particularly if the defendant, who claimed to have no fixed address, might have been wearing the same clothes that he wore the day prior. Whether or not Wharton described the odor as "burnt" marijuana is not dispositive. I credit his testimony.

The case of *United States v. Radcliffe*, 757 Fed. App'x 250 (4th Cir. 2018) (per curiam), provides guidance. There, the defendant sought to suppress evidence that he was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The case originated in Virginia, where possession of marijuana is illegal.

Detectives approached the defendant after receiving information that the defendant had been seen adjusting an object in his waistband, which was thought to be a weapon. One detective sought identification and, "early on in the encounter," the detective "detected a strong, localized odor of marijuana." *Id.* at 251. The detective commented about the smell of marijuana, and the defendant admitted that he had been smoking marijuana and had some on his person. *Id.* The defendant was searched, which yielded both a small amount of marijuana and a firearm. *Id.*

The defendant argued that he was seized when he was approached and his identification was requested, and therefore he claimed that the smell of the marijuana was the fruit of an illegal stop. *Id.* at 251-252. The district court concluded first that the police had reasonable, articulable

suspicion to conduct a *Terry* stop.  Second, he determined that the officer had probable cause to arrest the defendant and search him incident to that arrest, because of the odor of marijuana.  *Id.*

The Fourth Circuit concluded that the initial encounter was consensual, in light of *Drayton*, 536 U.S. at 201; *Weaver*, 282 F.3d at 311-12; *Santos*, 725 F.3d at 461-62; and *Black*, 707 F.3d at 537-38.  Thus, the Court was satisfied that the defendant was not seized at the time the officers approached him and asked for identification.  Rather, the Fourth Circuit upheld the district court's finding that the seizure occurred after the officers smelled marijuana on the defendant and, at that point, the officers had probable cause to arrest the defendant and search him incident to a lawful arrest, because possession of marijuana is illegal in Virginia.  *Id.* at 252.

Citing *Humphries*, the Fourth Circuit reiterated:  "[W]e have held that the odor of marijuana localized to a person can provide probable cause to believe that the person has committed or is committing the crime of possession of marijuana . . . ."  *Id.* at 252.  The Court pointed to the localized odor of marijuana that originated from Radcliffe, coupled with Radcliffe's admission that he had smoked marijuana and had some on his person.  *Id.* at 252-253.

The defendant was not searched until after probable cause was established.  And, as in *Radcliffe*, a valid search incident to a lawful arrest constitutes an exception to the warrant requirement.  *See Arizona v. Grant*, 556 U.S. 332, 338 (2009); *United States v. Currence*, 446 F.3d 554, 558-591 (4th Cir. 2006), *cert. denied*, 552 U.S. 1004 (2007).

### D.

Even assuming that Wharton lacked reasonable, articulable suspicion and/or probable cause, defendant's conduct in attempting to flee or resist arrest broke the chain of causation resulting from any illegal conduct on the part of the police.  When the fracas ensued, the gun and ammunition had not yet been discovered.  The defendant's attempt to flee or to resist the arrest

constituted an intervening circumstance sufficient to purge the taint of any illegality.  As the Court held in *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997), "[i]f a suspect's response to an illegal stop 'is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime.'"  *Id.* at 619 (citation omitted).

In *United States v. Gaines*, 668 F.3d 170 (4th Cir. 2012), "the contested evidence (the firearm) was only discovered after the defendant engaged in illegal activity subsequent to an earlier unlawful stop."  *Id.* at 174.  Therefore, in contrast to *Sprinkle*, the defendant's subsequent criminal conduct did not constitute an intervening event, "because it took place *after* the discovery of the firearm."  *Gaines*, 668 F.3d at 174.  In this case, however, the defendant's weapon had not been discovered until after the fracas occurred.

## IV. Conclusion

For all the reasons set forth above, I shall deny defendant's Motion.  An Order follows.


Date:   January 21, 2021                            _____/s/_____
                                                    Ellen L. Hollander
                                                    United States District Judge

25